945 A.2d 39 (2008)
399 N.J. Super. 453
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent
v.
T.M., Defendant-Appellant.
In the Matter of the Guardianship of C.S. and A.C., minors.
No. A-3791-06T4
Superior Court of New Jersey, Appellate Division.
Submitted November 28, 2007.
Decided January 18, 2008.
*40 Yvonne Smith Segars, Public Defender, for appellant (Vito A. Mazza, Designated Counsel, on the brief).
Anne Milgram, Attorney General, for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Patricia Parker, Deputy Attorney General, on the brief).
Yvonne Smith Segars, Public Defender, Law Guardian, for minors C.S. and A.C. (Phyllis Warren, Assistant Deputy Public Defender, on the brief).
Before Judges AXELRAD, PAYNE and SAPP-PETERSON.
The opinion of the court was delivered by SAPP-PETERSON, J.A.D.
Defendant, T.M., appeals from the January 30, 2007 Chancery Division, Family Part order awarding Kinship Legal Guardianship (KLG), N.J.S.A. 3B:12A-1 to -7 and N.J.S.A. 30:4C-84 to -92, to L.C., the maternal aunt of his biological son, A.C., and dismissing his counterclaim in which he sought an order directing the Division of Youth and Family Services (Division) to facilitate and pay for his visitation with A.C., who L.C. removed to North Carolina in July 2006 while A.C. and his sibling had been temporarily placed in her custody by the Division. Six months later, the trial court entered an order granting KLG of A.C. to L.C. Although defendant consented to the KLG, he contends that the court should not have awarded KLG to L.C. without first exercising its equitable power to fashion an accompanying visitation component that would have facilitated the exercise of his visitation rights and, in failing to do so, the court effectively terminated his parental rights.[1] We affirm the grant of KLG but remand to the trial court for further proceedings, in accordance with N.J.S.A. 9:2-2, to address L.C.'s removal of A.C. to North Carolina.
On February 27, 2005, A.C., who was born to T.M. and M.C. on May 23, 2003, was treated at Jersey City Medical Center for an abrasion on his forehead. L.C. brought A.C. to the hospital and reported that A.C.'s brother told her that A.C. had been injured during a domestic dispute between M.C. and M.C.'s paramour. The hospital social worker contacted the Division, and a caseworker was immediately assigned to investigate the matter. L.C. agreed to care for A.C. and his brother at that time. On March 1, 2005, the Division filed an abuse and neglect complaint and an order to show cause against M.C. The Division alleged that M.C, against whom it had previously investigated abuse and neglect allegations dating back to 1999, physically abused and exposed A.C. and C.S. to domestic violence in the home. The complaint requested that the court give the *41 Division temporary custody of the two children. The court ordered that A.C. and C.S. be made wards of the court and placed under the custody, care, and supervision of the Division.
When the Division filed the initial, complaint, M.C. refused to provide the names of the minors' fathers. Through its records, however, the Division learned their names and filed an amended verified abuse and neglect complaint and an order to show cause on June 17, 2005. The amended complaint named T.M. as the father of A.C., and C.S., Sr. as the father of C.S. At the time the amended complaint was filed, the Division could not locate defendant and a search was initiated for him.
On December 7, 2005, the court approved the Division's proposed permanent plan to place A.C. and C.S. in the custody of L.C. because M.C. was unable to care for her children at that time. The order also indicated that the Division was investigating the fathers who had recently come forward.
On April 10, 2006, the court conducted a protective service review, and defendant, for the first time, appeared at the proceeding. He was represented by counsel, who advised the court that defendant wanted custody of A.C. and was willing to undergo a psychological evaluation and attend parenting classes, was employed, and had a furnished apartment. Defense counsel also informed the court that T.M. was one of fourteen children and several of his six sisters had pledged to give him assistance with A.C. A Division caseworker confirmed that defendant had been in contact with L.C, at least by telephone, to maintain contact with A.C. Finally, defense counsel indicated that the Division had not provided any services to defendant, to which the Division responded that defendant had never requested any services. The court directed the Division to provide services and to develop a case plan for defendant.
On July 25, 2006, the court held an emergency hearing. Defendant appeared, along with defense counsel. Defense counsel advised the court of her belief that the "matter is on a downward spiral to the . . . detriment of [her] client and [she thought] . . . the case [had] to be put on the correct path." One of the chief concerns expressed by defense counsel was that defendant had learned that A.C. and his brother
had in fact been sent to South Carolina without an interstate [sic], with the custodian who has expressed to my client an intent to move to South Carolina and, therefore, I think, Your Honor, that the entire situation has been very much to the detriment of my client because my client has not been permitted to have me come to court and put his position on the record with reference to these things and, most certainly, to object to decisions being made in this case without his participation and, also, with reference to the sending of the children out of state without the court's knowledge or approval, and it has been my experience, and I have been doing these cases for a lot of year[s], that when the children go out of the . . . state temporarily or permanently there must be an advocation [sic] to the court. And, further, if the children are [going to] be sent anywhere permanently, before they can be sent anywhere permanently . . . there has to be an interstate done, and I'm sure the court recalls that we have another case here, not with [plaintiff's counsel], with someone else where terrible issues have arisen because the interstate was never done.
And, therefore, Your Honor, I think we're so  this case is so out of bounds that something has to emanate from the court to get this back on track now.
*42 The Division advised the court that although L.C. had initially expressed her desire to relocate to South Carolina, her plans changed and that "[L.C.] stated that something didn't go through, maybe it was a job or maybe it was where she was [going to] stay, and she wanted to come back here." The Division informed the court that the children were on vacation in North Carolina and that "[g]enerally, as long as the children aren't being taken out of the country, if it's for [a] finite period of time and it's not over 30 days, the Division can consent with a case plan and an affidavit in lieu of . . . all of the arrangements, and that is what's done." The court ordered that the matter proceed to a regular review on September 20, 2006.
Two days later, a second emergency hearing was conducted, at which time the Division advised the court that L.C. planned to relocate out of state. Defendant objected and his attorney pointed out to the court that the Division was sanctioning this plan without complying with the
interstate compact on children, [N.J.S.A.] 9:23-5, which requires that if children are removed from the [S]tate of New Jersey and are placed in a home outside the [S]tate of New Jersey under any circumstances, the child welfare authorities in that particular state have to be notified. They have to, at a bare minimum, look over the physical plant where the children are and check out the entire situation and be the eyes and ears of [the Division] in that particular state.
In this particular instance not only is [the Division] desirous of violating the interstate compact, apparently [L.C.] has not designated the address [where] she's going to be residing permanently. She is transient, she may or may not be homeless when she . . . leaves the state. We don't know where the children are, we don't know who the children are with. This is not what's . . . contemplated by law and I think it's just blatantly illegal.
But even if they were going to place the children out of state . . . [L.C.] has to go there, find the place . . . she's going to live, have the permanent place, have it checked out by the local welfare agency, and then perhaps, if everything is okay and . . . other things don't come into it like defense counsel objecting, the children would be placed under those circumstances, and this can take six months to a year, but [L.C.] has made her decision she doesn't want to live in New Jersey and . . . if she wants to take the children with her[,] [the Division] must comply with the statute and they cannot, as a matter of law, do what they want to do.
Be that as that may [sic], even though they will comply with the . . . contact which they . . . haven't, my client still objects very strenuously to the children being removed from the [S]tate of New Jersey. Now, while they're in the [S]tate of New Jersey my client has easy access to the children, he has a good relationship with [L.C.] and when she's here he can see the children and she supervises it, so that is not a problem. However, he does want his child. He definitely wants his child. The child knows him, he knows the child. . . . [A]nd if he can't have the child, and there's no problem with him whatsoever, he's the father . . . there's no objection to him, he's completely appropriate and he has superior rights to anybody else if . . . the mother is unfit in the circumstances that [the Division] is saying. He has superior rights.
The court's response to defendant's objection at that point was that

*43 [t]he children have resided with their current . . . caretaker for some 17 months. I leave it up to the Division to establish that the defendants' due process rights have been met at a further hearing with regard to their claim that their rights have been violated, and the court will determine whether or not . . . there is merit to the claim of defense counsel with regard to the failure of the Division to follow through with its responsibilities.
The . . . children enjoy a stable family environment with their current caretaker. This is the life that they have known for the last 17 months and will be continued pending further hearing to determine the ultimate issues.
With respect to the claim that the litigation is in any way going to be delayed by the current arrangement or that the interstate process requires anything more than what the Division is offering, I believe is to deny basic rights to this family which has . . . announced a[n] apparent desire to relocate. . . . So long as the rights of the defendants are met and the Division meets its statutory obligations, which it claims it is doing, the current case plan should move forward. This at a time when the defendants, according to what is being represented, are provided with contact with the children, counsel are provided with the ability to have the children meet with their experts and . . . as such, the current case plan to provide permanency with the current caretaker is to continue.
At the conclusion of the hearing, the court ordered that the matter would return to court on September 20, for a compliance review, as previously scheduled.
Defense counsel referred defendant for a defense psychological evaluation with Dr. Richard Klein (Klein), which took place on August 11, 2006. In his report, Dr. Klein acknowledged that "[o]f concern is the fact that [defendant]^ current apartment is most likely not suitable for having [A.C.] live with him. To that end, [defendant] discussed the possibility of living with one of his twelve siblings who are in the Jersey City area." Klein opined that defendant is capable of parenting and protecting A.C. He recommended that it was in A.C.'s best interest to reside with defendant.
On September 20, at the compliance review, defendant offered himself as a primary care provider for A.C. The Division responded that defendant had not initially offered himself as a primary care provider for A.C. and that he had not attended parenting classes, which defendant disputed. Further, the Division advised the court that defendant had not undergone the psychological evaluation it had offered. The court ordered defendant to undergo a psychological evaluation. It also ordered the Division to facilitate visitation between A.C. and defendant.
At the next review hearing conducted on December 5, 2006, defense counsel confirmed that defendant was not in a position to take custody of A.C. for at least one year. Defense counsel raised the issue of visitation and visitation costs, in light of L.C.'s relocation out of state and, in order to preserve these issues, advised the court that a counterclaim seeking visitation at the expense of the Division would be filed. The court entered a permanency order adopting the plan of KLG for A.C. and C.S. and also granted the Division's motion to amend its March 1, 2005 complaint to seek KLG.
The hearing on the amended complaint occurred on January 30, 2007. Defense counsel argued that the court should enter an order directing the Division to facilitate visitation that was affordable to defendant or, alternatively, absorb the costs of visitation, *44 noting that defendant was currently unemployed and collecting unemployment and that the round trip rail transportation cost for each visit was $300. The court responded that "a consequence of the implementation of the permanency plan is the fact that the Division will no longer be involved in the day to day management of the lives of these children."
Defense counsel urged further that since the court is a court of equity, the court could carve out an equitable visitation remedy. The court responded that it was unaware of any "legislative authority that would provide the court with the ability to continue to direct facilitated visitation[.]" The court, however, ordered the Division to pay for one more visit between A.C. and his parents but stated that any further "[v]isitation will be subject to the discretion of the caretaker following the granting of KLG." The court determined that "[w]hatever the arrangement is between [L.C.] and [defendant] I assume [it] will continue and, if there is disagreement, the means by which it can be addressed is by application to the court."
After ruling that the Division had no obligation to facilitate or pay for defendant's visitation expenses, the court then questioned defendant directly as to his position on the proposed KLG:
THE COURT: As to the Kinship Legal Guardianship plan that is being presented, you have discussed it with your attorney, is that correct?
[DEFENDANT]: Yes.
THE COURT: And has [your attorney] answered to your satisfaction the questions that you have had?
[DEFENDANT]: Yeah. Yes.
THE COURT: Do you oppose or consent to the Kinship Legal Guardianship that is being presented as the permanency plan for your child?
[DEFENDANT]: I consent to it.
THE COURT: Do you understand that the court is not going to order, aside from one final visit, that the Division facilitate visitation? Do you understand that[,] sir?
[DEFENDANT]: Yes.
. . . .
THE COURT: [Defendant], with respect to the plan that has been arranged for . . . your child, at this point you're indicating that you are in agreement with the Kinship Legal Guardianship being in your child's best interests. Do you have any reservation about that?
[DEFENDANT]: No.
THE COURT: And you have considered . . . proposing alternative plans to the court as the permanency plan for your son?
[DEFENDANT]: Yes.
THE COURT: But you decided to consent to the current plan, is that correct?
[DEFENDANT]: Yes.
. . . .
THE COURT:  and you are indicating that you are providing for a disposition in your mind that you feel is appropriate because your son and his brother will continue to reside together?
[DEFENDANT]: Well, I'm . . . consenting to it, but at first I wanted just custody of my son, but after [the Division] said that they wanted to keep them together I had no choice.
THE COURT: Well, you do have a choice and, if you haven't discussed it further with your attorney in terms of proposing an alternative, you really need to make that decision because I don't want the disposition to be one in which you waive any rights without having considered what your child's life would be with your plan as opposed to the *45 Division's plan, because your plan must be considered a primary plan by the court and I don't want you to give up any status that you have now by deferring to Kinship Legal Guardianship without considering alternatives. I believe you have already . . . done so, but if you have any question about that you have a right to go to trial and you have a right to a hearing to determine the issue of . . . custody.
[DEFENDANT]: Okay.
THE COURT: Now, the court might agree with the Division, it might agree with some alternative plan, I don't know at this point. So it's up to you at this point to make that decision and I don't want you to make it lightly, I want you to make it with benefit of counsel, and I don't want you just to say you agree because  for any reason other than the fact that you believe that it's in the best interests of your child.
[DEFENDANT]: Yes.
THE COURT: Okay?
[DEFENDANT]: I  yeah, I understand.
THE COURT: And have you discussed the matter with your attorney in terms of alternatives?
[DEFENDANT]: Yes.
THE COURT: And have you come to a determination?
[DEFENDANT]: Well, eventually I plan on moving closer towards him so, God willing, I'll be able to get myself situated to go closer towards him, towards-further south.
THE COURT: Okay.
[DEFENDANT]: That's the only alternative I have as of now.
THE COURT: So then you have considered alternatives and you are in agreement with the plan, is that correct?
[DEFENDANT]: Yes.
Defense counsel advised the court that she wanted to speak to defendant once again to make sure that "he is desirous of not opposing the Kinship Legal Guardianship, however discontent he may be with reference to the court's ruling with reference to the financial aspect of . . . visitation[.]" After doing so, defense counsel raised no objection to the KLG, but once again pursued defendant's request that the Division facilitate visitation and assume the costs of those visits. The court did not alter its earlier ruling and entered its order granting KLG to L.C. and dismissing defendant's counterclaim. The present appeal followed.
Our scope of review of a trial court's fact-finding function is limited. "Findings by the trial [court] are considered binding on appeal when supported by adequate, substantial, and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). Because of the Family Part's special jurisdiction and expertise in family matters, we accord particular deference to a Family Part judge's fact-finding. Cesare v. Cesare, 154 N.J. 394, 413, 713 A.2d 390 (1998). However, "a trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995).
Defendant's disagreement with the trial court is not with the grant of KLG to L.C.T.M. advised the court that he was not in a position to take custody of A.C. for at least one year and acknowledged that the grant of KLG to L.C. was in A.C.'s best interest at that point. However, defendant disagrees with the court's conclusion that it lacked statutory authority to fashion an appropriate visitation remedy in conjunction with the award of KLG to L.C. *46 Moreover, defendant argues that the court erred when it did not, during the emergency hearings held in July 2006, intervene in L.C.'s initial removal of A.C. from New Jersey in July 2006, and later erred when it entered the order granting KLG to L.C. without fashioning an appropriate visitation remedy. More pointedly, defendant maintains that because a kinship legal guardian, by statute, stands in the shoes of a natural parent, L.C. "can be likened to the custodial parent in family law" and is therefore subject to the statutory provisions governing the removal of a child from the state without the consent of the non-custodial parent under N.J.S.A. 9:2-2.
In response, the Division argues that N.J.S.A. 9:2-2 does not apply under the facts presented here because T.M. and C.M. were never married. Additionally, the Division, without specific reference to any authority, urges that visitation is a "placement-related activity" for which funding for visitation is not provided.
Our discussion begins with a review of N.J.S.A. 3B:12A-4(a)(1), which provides: A kinship legal guardian shall have the same rights, responsibilities and authority relating to the child as a birth parent, including, but not limited to: making decisions concerning the child's care and well-being; consenting to routine and emergency medical and mental health needs; arranging and consenting to educational plans for the child; applying for financial assistance and social services for which the child is eligible; applying for a motor vehicle operator's license; applying for admission to college; responsibility for activities necessary to ensure the child's safety, permanency and well-being; and ensuring the maintenance and protection of the child.
The underlying purpose of KLG is to "formalize the status of a relative who agrees to take on responsibility for a child, [see N.J.S.A.] 3B:12A-4a(1), and can remain in place throughout the child's minority, [N.J.S.A.] 3B:12A-4a(6)." N.J. Div. of Youth and Family Servs. v. P.P., 180 N.J. 494, 510, 852 A.2d 1093 (2004). In that status, certain parental rights and responsibilities are transferred to the caregiver, who becomes legally responsible for the care and protection of the child and for providing for the child's health, education and maintenance in the same manner as biological parents. KLG, however, does not terminate parental rights and parents, for example, remain obligated to pay child support, N.J.S.A. 3B:12A-4(a)(3), and retain visitation rights, N.J.S.A. 3B:124(a)(4).
By reserving to parents visitation rights, the Legislature codified its intent that the permanent and self-sustaining nature of KLG is not intended to supplant the right of parents to maintain "some ongoing contact with the child[.]" N.J.S.A. 3B:12A-1(b). Consequently, in our view, the kinship legal guardian may not take action that effectively terminates a parent's visitation rights without first demonstrating to the court that the action, irrespective of its impact, is in the best interest of the child. That was not done here.
Additionally, we disagree with the Division's position that New Jersey's removal statute does not apply to parents who were never married, as is the case with T.M. and M.C. N.J.S.A. 9:2-2 provides:
When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the *47 court, upon cause shown, shall otherwise order. The court, upon application of any person in behalf of such minors, may require such security and issue such writs and processes as shall be deemed proper to effect the purposes of this section.
[(emphasis added).]
When construing a statute to discern legislative intent, unless a statute expressly states otherwise, we ascribe ordinary meaning to words and phrases. DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005). The statute's provisions expressly apply to parents, whether "divorced," "separated" or "living separate." See E. v. T., 124 N.J.Super. 535, 543, 308 A.2d 41 (Ch.Div.1973) (citing Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)) (noting that "[d]istinctions affecting the substantial rights of . . . natural parents based upon the illegitimate status of the child have been `held to be violative of the due process clause of the Fourteenth Amendment and a denial of equal protection of the law under the Constitution of the United States.").
In E. v. T., supra, the defendant-mother surreptitiously removed her two children from New Jersey to Las Vegas. The children had been living with their natural father, who never married the defendant-mother. Id. at 540-41, 308 A.2d 41. The plaintiff-father filed a verified complaint in support of an application for issuance of an order to show cause why the children should not be returned to New Jersey. The defendant-mother moved to dismiss the action on jurisdictional grounds arguing that under N.J.S.A. 9:16.1,[2] as the natural mother of the two illegitimate children, she had "exclusive right to the custody of the children and an absolute right to remove them from [New Jersey]." Id. at 542-43, 308 A.2d 41. The court rejected this argument, finding N.J.S.A. 9:16-1 inapplicable since the plaintiff-father acknowledged paternity and noted that "[t]he provisions of N.J.S.A. 9:2-2 are definitive legislative expressions of the public policy of the State of New Jersey" in so far as the removal of children from the state. Id. at 541, 308 A.2d 41. The court concluded that New Jersey was the proper forum to resolve the custody dispute and referred the matter for investigation and a plenary hearing. Id. at 543, 308 A.2d 41.
Here, once the court entered its March 1, 2005 order directing that "[A.C.] and [C.S.] be made wards of the Court and be placed under the custody, care and supervision of the [Division]," the court had the authority to dispose of all ancillary legal issues, including whether L.C.'s removal of A.C. to North Carolina was in A.C.'s best interest. Brennan v. Orban, 145 N.J. 282, 293, 678 A.2d 667 (1996). While the resolution of whether L.C.'s removal of A.C. from this State was in A.C.'s best interest may require consideration of factors similar to those the court considered in determining whether KLG was in the best interest of A.C., removal of a child from the state without the consent of the non-custodial parent implicates additional considerations. See Baures v. Lewis, 167 N.J. 91, 770 A.2d 214 (2001).
In Baures, supra, the Court held that the custodial parent, who in this case, by virtue of N.J.S.A. 3B:12A-4(a)(1), is L.C., must prove a good faith motive for the relocation and also that the move will not be inimical to the best interest of the child. Id. at 116, 770 A.2d 214. The Court provided twelve factors that courts must consider before allowing a custodial parent to remove a child from New Jersey without the consent of the non-custodial parent:

*48 (1) the reasons given for the move;
(2) the reasons given for the opposition;
(3) the past history of dealings between the parties insofar as it bears on the reasons advanced by both parties for supporting and opposing the move;
(4) whether the child will receive educational, health and leisure opportunities at least equal to what is available here;
(5) any special needs or talents of the child that require accommodation and whether such accommodation or its equivalent is available in the new location;
(6) whether a visitation and communication schedule can be developed that will allow the noncustodial parent to maintain a full and continuous relationship with the child;
(7) the likelihood that the custodial parent will continue to foster the child's relationship with the noncustodial parent if the move is allowed;
(8) the effect of the move on extended family relationships here and in the hew location;
(9) if the child is of age, his or her preference;
(10) whether the child is entering his or her senior year in high school at which point he or she should generally not be moved until graduation without his or her consent;
(11) whether the noncustodial parent has the ability to relocate;
(12) any other factor bearing on the child's interest.
[Id. at 116-117, 770 A.2d 214.]
Here, as part of the KLG proceeding, L.C. testified telephonically. She was not questioned relative to the Baures factors. The focus of the questioning from the court and counsel was L.C.'s willingness to serve as a kinship legal guardian and her willingness to permit visitation by the parents. We note that there were other deficiencies in the record. For example, as early as April 2006, the psychological evaluation provided by Dr. Robert Clyman indicated that L.C., when interviewed, expressed a desire to relocate to North Carolina due to her strained relationship with M.C. Dr. Clyman wrote:
[L.C.] presented as both angry and on the verge of tears throughout her interview, contending that she is "exhausted" from having to deal with [M.C.]'s allegations against [her] at the same time that she is trying to provide a home as a single mother for [M.C.]'s children. Rather than simply continue with the present arrangement, [L.C.] is seeking legal guardianship of the children, so that she can relocate with them to North Carolina, which she regards as a more hospitable environment.
Nonetheless, the Kinship Legal Guardianship Assessment prepared in accordance with N.J.S.A. 3B:12A-5 makes no reference to L.C.'s relocation to North Carolina and although the report is dated December 2006, it lists L.C.'s address as "569 Montgomery St.[,] Apt. 515[,] Jersey City, NJ[.]" By the date of the assessment, L.C. had been in North Carolina for several months. Yet, the record contains no information about L.C.'s living arrangements in North Carolina or the reasons for her relocation. As part of the court's determination about whether to appoint the caregiver as kinship legal guardian, the Division is required to conduct a "caregiver's home review." See N.J.S.A. 3B:12A-5(b)(13) and N.J.S.A. 30:4C-85(a)(1). Nothing in the record indicates that any such review was conducted of the North Carolina home.
Given T.M.'s consent to the KLG, we do not find these deficiencies necessarily fatal to the grant of KLG. Defendant, however, is entitled to have the court consider the applicable Baures factors in determining whether L.C. has proved "that (1) there [was] a good faith reason for the move and *49 (2) that the move will not be inimical to [A.C.'s] interest," Baures, supra, 167 N.J. at 118, 770 A.2d 214. Further, as part of that proceeding, the court should require the Division to submit a supplemental "caregiver's home review" to reflect its assessment of L.C.'s living arrangements in North Carolina, an evaluation the Division should have conducted prior to amending its complaint in December 2006 to include a petition for KLG.
The Division, as an additional objection to Division-facilitated visitation under KLG, argued that in proceedings in the Family Part, under N.J.A.C. 10:132A-2.1, visitation is a "placement-related activity" that is not covered in its monthly stipend to L.C. N.J.A.C. 10:132A-2.1 is part of Chapter 132A of the Division regulations that implement legal guardianship under Title 3B and Title 30. See N.J.A.C. 10:132A-1.1 to -3.5 Legal Guardianship. "Placement-related activity" is not defined under the regulations and, given other provisions contained in this chapter, its applicability to the present matter is unclear.
Under Chapter 132A, specifically, N.J.A.C. 10:132A-1.6(b)(5) and (6), "a child is eligible for the [Division] Legal Guardianship Subsidy Program when . . . [t]he relative and the child live in New Jersey," and "the relative interested in being approved for the program has obtained kinship legal guardianship, pursuant to the Kinship Legal Guardianship Act, N.J.S.A. 3B:12-5[.]" Also under N.J.A.C. 10:132A-1.10(a)(6), a child "shall be terminated from the [Division] Legal Guardianship Subsidy Program when . . . [t]he relative and child no longer live in New Jersey[.]" Here, the record reveals that L.C. received a monthly stipend before KLG was granted, the stipend was not discontinued when L.C. relocated to North Carolina, and the Division advised the court that in the event KLG was granted, "L.C. will continue with a monthly stipend for the children." In view of the clear language of the eligibility and termination provisions, we can only assume that L.C.'s "monthly stipend" derives from another source of funding, which may also be a source of funding to defray visitation costs. In any event, on this record, we are not prepared to conclude, as a matter of law, that visitation costs for the benefit of A.C. to visit T.M. or vice versa, is a placement-related activity for which no funding is available under Chapter 132A. The trial court, during remand proceedings, may wish to take additional testimony on this issue.
The order granting KLG to L.C. is affirmed, the order dismissing defendant's counterclaim is reversed, and the matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] M.C., A.C.'s biological mother, consented to KLG. Through counsel, she joined T.M. in objecting to KLG without a DYFS facilitated or funded visitation component. She has not, however, appealed the January 30, 2007 order.
[2] N.J.S.A. 9:16-1, which was repealed by N.J.S.A. 9:17-40, described the extent of the parent and child relationship as extending "equally to every child and to every parent regardless of the marital status of the parents." (emphasis added).