# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3699-17T1

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

Q.B. and C.G.,

     Defendants,

and

C.H.,

     Defendant-Appellant.

_____

IN THE MATTER OF Q.B., H.H.,
J.H., and C.H., Jr.,

     Minors.

_____

Argued September 11, 2019 – Decided September 23, 2019

Before Judges Koblitz, Whipple, and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0140-16.

Beatrix W. Shear, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Beatrix W. Shear, on the briefs).

Michael A. Thompson, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Michael A. Thompson, on the brief).

Olivia Belfatto Crisp, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Olivia Belfatto Crisp, on the brief).

PER CURIAM

C.H. (Chris[1]) appeals from a May 2, 2016 order following a fact-finding trial which concluded he committed abuse or neglect of his children, H.H. (Heather), J.H. (John), and C.H., Jr. (Chuck), and Q.B. (Quincy), ages six, three, and two and eleven, respectively, at the time of trial.[2] The trial judge concluded Chris placed the children at risk of substantial harm by allowing them to reside

---

[1] We use pseudonyms to protect the children's identities. R. 1:38-3(d)(12).

[2] Chris and Q.B. (Quinn) are the biological parents for Heather, John and Chuck. Chris is the biological father of Quincy.

A-3699-17T1

in a home where marijuana was accessible and exposing the children to individuals who used the substance inside the residence. We affirm.

We take the following facts from the record of the fact-finding hearing. The Division of Child Protection and Permanency (Division) received multiple referrals involving this family in 2012 (two), 2013, and 2014 (two), including, among others, allegations of illicit drug use. In November 2015, the Division received the referral in this matter from Heather's elementary school advising she brought a "blunt," a hollowed out cigar filled with marijuana, to school. The school contacted the New Brunswick Police Department and Officer David Pagan responded to interview Heather. Heather informed him she knew the blunt contained drugs and stated she brought it from her home. Pagan confirmed the blunt contained marijuana.

Division caseworker Ebony Williams arrived at the school the same day to interview Heather. The child stated she brought the modified cigar to school, and stated "inside the black thing is green stuff . . . it's a blunt. It's for grown-ups. You smoke it, but it's bad for you." Heather also stated a person named D. (Danielle) lived at the home, slept on a red pull-out mattress in the living room, and smoked marijuana in the basement. She informed Williams she found the blunt under Danielle's pillow the morning before she brought it to school.

3

Heather explained to Williams what a blunt wrapper was and recounted Danielle often had them in her back pocket.

Heather also stated other individuals smoked marijuana in the basement of her home and she was in the basement with those individuals. She explained marijuana smelled differently than cigarette smoke and demonstrated how marijuana was rolled into blunts. Heather described other drug- and alcohol-related activity by her mother and others in the residence, however, it was not the focus of the trial judge's findings.

Williams then interviewed Quincy. He explained there were numerous visitors to the home and both of his parents smoke cigarettes. He recalled he was in the basement and observed people, including his maternal grandfather, R.E. (Randy), handling material which was "green and stringy" and "add[ing] some brown stuff to it" prior to rolling it up. Quincy told Williams he saw the green and brown material in an ashtray stored upstairs. He corroborated Heather's testimony regarding Danielle, stating he observed her smoking marijuana and she often kept rolling papers in her back pocket.

Williams interviewed Randy who advised he currently resided with the family. When Williams asked Randy to see the basement, he asked whether he could enter the basement alone first because there were "illegal things down

there." Once in the basement, Williams observed marijuana on top of the washing machine, brown material which appeared to be marijuana and paraphernalia. Randy brushed the marijuana into a container and informed Williams the drugs belonged to him. Williams noted there were children's toys and a mattress in the basement, roughly two adult steps away from where the marijuana was located.

Williams interviewed Chris. He confirmed Danielle sometimes slept at the home on the red couch in the living room. He denied knowing whether Danielle or anyone else smoked marijuana in the basement and stated he was unable to detect the scent of marijuana emanating from the basement. Williams testified the marijuana odor was readily apparent when she visited the home. Chris stated Randy served as a caretaker for the children, but claimed he was never under the influence of drugs or alcohol while caring for them. He also denied any personal drug use, knowledge of whether Quinn used drugs, or how Heather found the blunt she brought to school.

Williams interviewed Quinn who stated she did not use marijuana and denied knowing Heather brought marijuana to school. She also denied seeing or smelling drugs in the basement, or anywhere else in the home. When asked how Heather had so much knowledge of marijuana, Quinn claimed the child was

A-3699-17T1

often around adults and sometimes acted like one.  Williams later elaborated at the fact-finding hearing that Chris and Quinn both believed Heather was being untruthful and derived her knowledge from listening to adult conversations and watching the television show "CSI" and the Discovery Channel.

Following its investigation, the Division removed all four children and substantiated Chris and Quinn for "substantial risk of physical injury/environment injurious to health and welfare."  The Division based its findings on: (1) Heather and Quincy's disclosure of drug use in the home by multiple adults, (2) both children reporting having access to the drugs, including Heather finding the blunt and bringing it to school, and (3) the drug use occurring in the home.  The Division filed a verified complaint for custody of the children pursuant to N.J.S.A. 9:6-8.21 and 30:4C-12 setting forth a detailed recitation of its allegations against the children's parents.

Neither parent testified nor called any witnesses at the fact-finding trial. The trial judge found it was undisputed Heather brought marijuana to school, which she obtained from home, and knew was marijuana.  He noted it was also undisputed that a number of other individuals lived in the home, including Danielle, who both Heather and Quincy confirmed slept in the home on the red couch, where Heather found the marijuana.  The judge found many people

6

residing in the home smoking marijuana in the basement near where the children's toys were located, and that marijuana was stored in plain view on top of the washing machine.

The judge concluded Heather was able to identify a blunt, describe its contents, and knew the odor of marijuana. He found Heather's statements corroborated by Williams' observations, Pagan's testimony, and Quincy and Randy's statements. The judge found Quincy's statements proved several individuals entered the basement to smoke marijuana, and he too could describe the color and texture of marijuana from these interactions. The judge noted Williams' observations supported and corroborated Quincy's, noting she observed the red couch in the living room and marijuana in the basement within two adult steps of the children's toys.

The judge concluded:

> the competent, reliable, and corroborated evidence . . . produced at trial proves by a preponderance of the evidence that the defendants placed the children at a risk of substantial harm, specifically by allowing them to reside in an environment where drugs were accessible to the children, used in front of the children, and where the children were exposed to people who were under the influence after having smoked marijuana. Based on testimony at trial, this [c]ourt finds that [Heather], age [six], and [Quincy], age [eleven], were both repeatedly exposed to drugs in the home and that they were in close proximity to those

A-3699-17T1

drugs. This finding is made, as there is no other credible evidence to explain how children at such a young age would know the color of marijuana, the texture of marijuana, the smell of marijuana, that marijuana is rolled, that it was rolled in papers, that it was smoked, that it was bad for you, that they would be able to describe how marijuana was rolled. No other explanation has been given to explain how or why [Heather] was in possession of marijuana that she brought to school and no other explanation has been brought to explain how both children, [Quincy] and [Heather], would both know that there were drugs in the basement. The reason they knew there were drugs in the basement is because they witnessed it. They saw [people] rolling and smoking in the basement. She knew there were drugs in the basement because she not only observed them there, but [Heather] was in the basement herself playing with her toys and this [c]ourt finds that her testimony was credible and corroborated by the toys that were in the basement. The [c]ourt finds that these drugs were open and accessible to both children.

The Division's complaint alleged Heather stated Quinn used other illicit substances such as "mollies,"[3] but the judge concluded the Division had not met its burden of proof on this allegation. However, the judge found the assertion probative of the general atmosphere in the residence. He stated:

While the [c]ourt does not find that the Division has proved that mollies were in the house, this [c]ourt, which has already found through testimony and

_____

[3] Molly, or MDMA, is a form of the "party drug" ecstasy. DEA, <u>Ecstasy or MDMA (also Known As Molly)</u>, DEA (Sept. 13, 2019) <u>https://www.dea.gov/</u>factsheets/ecstasy-or-mdma-also-known-molly.

observations, that there was open and repeated drug use in the home where the children were, finds that [Heather] knowing . . . about mollies was consistent with the finding that there was drug use in the home to which the children were repeatedly exposed to.

The judge rejected defendants' assertion the children's knowledge was from watching television. He stated:

> This [c]ourt is aware that both defendants deny any knowledge of drugs in the home, deny any knowledge that people use drugs in their home. This [c]ourt similarly finds this denial to be simply incredible given that the drugs and drug use in the home were as open as they were and observable to the children. The drugs and drug use in the home were not hidden from the children, but rather were done in front of the children, who learned the color, smell, texture of marijuana, knew it was rolled and could even demonstrate how to roll it. This [c]ourt has no reason, given this corroboration, to disbelieve [Quincy] that his mother was in the basement while people smoked marijuana. Regardless, however, her being in the basement is inconceivable to this [c]ourt and with the open drug use in the home, with the number of people going in and out of the home smoking marijuana, with the presence of marijuana being in the home, that these parents did not know what was going on. If they had looked on their couch where [Heather] had looked, they would have seen marijuana. If they went down to the basement to do the laundry where the [Division] worker went, they would have seen the marijuana. If they had gone down into the basement to see [Heather], who was playing with her toys, they would have seen the marijuana. That marijuana was there. It was in at least two places. The [c]ourt finds by a preponderance of the evidence that these parties, regardless of whether or not

they smoked marijuana themselves, certainly knew that there were drugs in the home and drugs were being used in the home.

The judge concluded the totality of the circumstances demonstrated the children were placed at substantial risk of harm. He stated "it was simply good fortune and luck" Heather or Quincy did not ingest or consume the marijuana obviously present in the home. He further found:

> [These] children were also in the home with people who were under the influence. The [c]ourt, while finding that [Randy] was not under the influence on that day while caring for the children, the [c]ourt does find that based on the corroborated testimony, [several people] would smoke in the home when the children were present.
>
> In addition to the real risk of ingesting the drugs and being around people high on drugs, this [c]ourt also finds that [Heather]'s perceptions of being an adult have been seriously impaired by the environment in which she's living.
>
> While, unfortunately, neither child would cooperate in the clinical assessment of . . . [the] hospital because they did not want to get their parents in trouble and were discouraged or warned by their parents not to cooperate, . . . [Heather]'s answers that she provided to the therapist as to her three wishes gives a clear indication that her environment has affected her psychologically and is impairing her.
>
> In her three wishes she indicated she wanted to be like her mom and grow up . . . "so I can be grown up so I can curse, so I can say shit and stuff[.]" . . . "I also

want to be a grownup so I can have hair on my business."

The judge concluded the Division proved abuse or neglect by a preponderance of the evidence pursuant to Title Nine. He also stated "based on the clinical assessments [entered into evidence], as well as the facts, as outlined in this case, . . . this family is clearly in need of Division services" and a Title Thirty finding would be appropriate to continue to ensure the safety and welfare of the children going forward.

I.

"[W]e generally defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 112 (2011) (quoting N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 396 (2009)). "Because of the Family Part's special jurisdiction and expertise in family matters, we accord particular deference to a Family Part judge's fact-finding." N.J. Div. of Youth & Family Servs. v. T.M., 399 N.J. Super. 453, 463 (App. Div. 2008) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

A-3699-17T1

We must examine "whether there was sufficient credible evidence to support the trial court's findings." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010). Although we may have reached a different result, "[w]e will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

Chris claims the trial judge erred when he found abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b) rather than N.J.S.A. 9:6-8.21(c)(4)(a), which was a finding of inadequate shelter sought by the Division. He asserts substance abuse and inadequate supervision were not claims before the court at the hearing. Chris argues the Division's finding of a risk of harm to the children due to substance abuse was not established, which "preclude[d] a finding of substance abuse at trial[.]" He contends the court's findings violated his due process rights because the Division did not set forth a claim pursuant to N.J.S.A. 9:6-8.21(c)(4)(b) and did not provide him with adequate notice it would pursue a finding under such grounds. Chris claims the Division was not entitled to a Title Nine finding because it failed to prove actual or imminent impairment of a

physical, mental, or emotional condition, and that he did not exercise a minimum degree of care.

Chris also asserts the trial judge erred in finding the family needed services pursuant to N.J.S.A. 30:4C-12, because a summary hearing pursuant to N.J.S.A. 30:42-12 was not noticed. We address these arguments in turn.

II.

We reject Chris's arguments the Division could not seek a finding pursuant to N.J.S.A. 9:6-8.21(c)(4)(b), that there was a due process violation, and that there was no notice of the Title Thirty relief sought by the Division.[4]

The Division's complaint was filed pursuant to both Title Nine and Title Thirty, and alleged Chris abused or neglected the children by creating an environment injurious to their health and welfare by exposing them to substance abuse, among other claims. Furthermore, before the start of the fact-finding trial, the Division reiterated it was proceeding under N.J.S.A. 9:6-8.21(c)(4)(a) and (b). Indeed, the following colloquy occurred before the start of trial:

> THE COURT: Counsel, the [c]ourt was asking a question. The way that this letter was written, it was a very broad letter and the [c]ourt wants to know exactly

---

[4] We do not address the argument regarding the Title Thirty findings as the order on appeal pertains to the trial court's Title Nine findings and we only consider appeals from a formal judgment, not an oral opinion. Credit Bureau Collection Agency v. Lind, 71 N.J. Super. 326, 328 (App. Div. 1961).

what you are seeking. All right? The [c]ourt first wanted to know what portion of the statute, and you've indicated that it's [N.J.S.A. 9:6-8.21(c)(4)(a) and (b)], correct?

[THE DIVISION]: Yes.

THE COURT: And the [c]ourt also wanted to know if . . . within [N.J.S.A. 9:6-8.21(c)(4)(a) and (b)], [i]s this a case that we were going to be dealing with food, clothing, shelter, education? But you've now indicated that it's dealing with shelter, correct?

[THE DIVISION]: Yes, Your Honor.

Thereafter, the Division adduced testimony and evidence proving its claims. Chris participated in the hearing and through counsel cross-examined the Division's witnesses and challenged the evidence.

Regarding the due process argument, we have previously noted the following:

> As our Supreme Court stated:
>
> At a minimum, due process requires that a party in a judicial hearing receive "notice defining the issues and an adequate opportunity to prepare and respond." . . . [D]ue process forbids the trial court "to convert a hearing on a complaint alleging one act . . . into a hearing on other acts[.]"
>
> [T.M.S. v. W.C.P., 450 N.J. Super. 499, 505 (App. Div. 2017) (quoting J.D. v. M.D.F., 207 N.J. 458, 478 (2011)) (citations omitted).]

The record here amply demonstrates there was no due process violation. The Division provided actual notice of the grounds on which it intended to proceed and Chris defended against them.

III.

Chris argues the Division was not entitled to a finding under Title Nine because it failed to present competent, particularized evidence of a harm to the children, the trial judge found no harm, but only noted the risk of harm due to the presence of marijuana in the house. He contends none of the marijuana was in a form that the children could have ingested, Heather informed Williams marijuana is for adults, and neither child described marijuana as something they wanted to consume. He argues no expert evidence was presented to prove the harmful consequences of children ingesting marijuana or compare such risk of harm to children with the harm of consuming other household substances.

Although he does not contest marijuana was found in the residence, he asserts the Division failed to present evidence he was aware of drug use or the presence of drugs in the home. He further claims the record does not support the judge finding there were a number of people visiting the home and smoking marijuana. Additionally, Chris claims government policy toward marijuana has

become more lenient and there was no criminal prosecution in this matter. He notes Quinn was the target of the investigation, not him.

"Abuse and neglect actions are controlled by the standards set forth in Title Nine of the New Jersey Statutes." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 31 (2011). Regarding "the quantum of proof required in a fact-finding hearing brought under Title Nine, see N.J.S.A. 9:6-8.44, it is well established that [the Division] must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" Id. at 32 (quoting N.J.S.A. 9:6-8.46(b)).

The purpose of a fact-finding hearing is "to determine whether the child is . . . abused or neglected[.]" N.J.S.A. 9:6-8.44. "[T]he safety of the child shall be of paramount concern[.]" N.J.S.A. 9:6-8.28(a), -8.31(a), -8.32. An "[a]bused or neglected child" includes a minor child:

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . or by any other acts of a similarly serious nature requiring the aid of the court[.]

A-3699-17T1

[N.J.S.A. 9:6-8.21(c)(4).]

"Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of DMH, 161 N.J. 365, 383 (1999) (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 616 n.14 (1986)). "[W]hen there is no evidence of actual harm, the focus shifts to whether there is a threat of harm." N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015). "[T]he standard is not whether some potential for harm exists[,]" rather, "[a] parent fails to exercise a minimum degree of care when she is 'aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to the child.'" Id. at 183-84 (quoting N.J. Div. of Youth & Family Servs. v. J.L., 410 N.J. Super. 159, 168-69 (App. Div. 2009)). "[A] finding of abuse and neglect can be based on proof of imminent danger and a substantial risk of harm." Id. at 178 (citation omitted).

"Whether the parent has exercised the requisite degree of care is to be analyzed in light of the dangers and risks associated with the particular situation at issue." J.L., 410 N.J. Super. at 168 (citing G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82 (1999)). The trial judge must consider "the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof

A-3699-17T1

are synergistically related.  Each proven act of neglect has some effect on the [child].  One act may be "substantial" or the sum of many acts may be "substantial.""  N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329-30 (App. Div. 2011) (alterations in original) (quoting N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)).

Chris' arguments are unpersuasive.  The trial judge found the competent, reliable, and corroborated evidence demonstrated Chris repeatedly exposed Heather and Quincy to drug use in the family home.  No other credible evidence explained how young children would otherwise know marijuana's appearance, color, texture, and smell, how to use it, or the other details they revealed.

The trial judge found the explanations offered by defendants  insufficient to explain how the children gained this knowledge.  Further, he determined Chris' claim that he was unaware of the drugs in the home was not credible when compared against the substantial weight of the evidence adduced by the Division.  The judge's conclusion the children were placed at substantial risk of harm by Chris allowing them to reside in an environment where they were frequently exposed to individuals who were under the influence of marijuana, and drugs were present, accessible, and actually handled by Heather was supported by the record.  See State v. Fuqua, 234 N.J. 583, 595-96 (2018)

(finding substantial risk of harm to children who were exposed and had access to drugs, under N.J.S.A. 2C:24-4(a), which incorporates Title Nine).  "The ease of access to cocaine, heroin, and marijuana, and the attraction of brightly colored pills, all created a potentially lethal trap for the children that could have been easily sprung at any moment."  Id. at 596.  Even though only marijuana was found here, the totality of the circumstances support the trial judge's findings of risk of harm, which we decline to disturb under our deferential standard of review.

Because the Division's case centered on the risk of harm, the Division was not required to adduce expert testimony to demonstrate the harm of actually ingesting marijuana.  The fact Quinn was the target of the Division's investigation is irrelevant, because the court found both parents, who both lived in the home, were neglectful by repeatedly exposing their children to open drug use in the home.

Finally, Chris' argument as to changing public sentiment regarding the criminal prosecution of marijuana offenses is irrelevant to the risk of harm posed to the children by their contact with the substance and those using it.  The criminal prosecution of such matters is a separate consideration from a parent's responsibility to exercise a minimum degree of care to protect a child from harm

under Title Nine. The trial judge's findings were supported by the substantial, credible evidence in the record and did not constitute an abuse of discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3699-17T1