# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1991-17T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.L.A.,

     Defendant,

and

M.Z.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF L.A.A.,

     a Minor.

_____

Argued October 24, 2018 – Decided November 5, 2018

Before Judges Nugent, Reisner, and Mawla.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0176-17.

Anne E. Gowen, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Anne E. Gowen, on the briefs).

Jennifer A. Lochel, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jennifer A. Lochel, on the brief).

Linda V. Alexander, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defendner, of counsel; Linda V. Alexander, on the brief).

PER CURIAM

Defendant M.Z. appeals from a December 14, 2017 judgment terminating his parental rights to his son, L.A.A. We affirm.

The following facts are taken from the record. M.Z. and A.L.A. are the biological parents of L.A.A., who was born in January 2016, as well as another child born prior to L.A.A. M.Z. is also the father of four other children from another relationship. With the exception of L.A.A., M.Z. has surrendered his parental rights to all of his children.

2                                                A-1991-17T1

M.Z.'s surrenders came as the result of previous involvement with the Division of Child Protection and Permanency (Division) and failure to comply with several recommended services, including anger management, parenting classes, and inpatient drug treatment and drug screens. The incidents giving rise to the Division's involvement began in November 2007, when M.Z. was involved in a domestic violence incident and found in possession of a crack pipe, causing removal of M.Z.'s four oldest children. In January 2010, another domestic violence incident, in which M.Z. employed a hammer, resulted in another removal. In September 2012, the Division was alerted to issues of substance abuse and domestic violence between M.Z. and A.L.A. in the presence of one of the children, resulting in a third removal.

M.Z. also had a history of criminality, which absented him from L.A.A.'s life. He has been incarcerated since December 2015, and his earliest release date is December 2020. As a result, M.Z. has had no contact with L.A.A., never met the child, and has been incarcerated for the child's entire life.

The Division continued to receive referrals after M.Z.'s incarceration. In April 2016, the Division received a referral from the Waterford Township Police Department regarding an ongoing domestic violence incident involving a verbal altercation between A.L.A. and her mother, J.M. A.L.A. had been living for

3

approximately one month in J.M.'s home with L.A.A., and two of the child's half-siblings. J.M. requested A.L.A. leave due to her behavior.

A Division caseworker interviewed A.L.A. at the police station. A.L.A. reported she and M.Z. had moved to Florida in October 2015, but she moved back to Philadelphia in December 2015, after M.Z. was incarcerated. A.L.A. explained her living circumstances had been transient. She lived with friends, before spending a period of time living in a Philadelphia shelter after L.A.A.'s birth. In March 2016, A.L.A. moved into her mother's home with L.A.A., who was then two months old.

A.L.A. told the caseworker she suffered from multiple psychological disorders and had not been compliant with her current medication regimen. When the caseworker questioned J.M., she stated the argument between her and A.L.A. was only verbal, she had asked A.L.A. to leave the home, and "if a removal was needed for the baby, she [did not] want to be considered for placement." A.L.A. and L.A.A. continued to live transiently after leaving J.M.'s residence.

In May 2016, A.L.A. brought L.A.A. to the Division office. A.L.A. made unfounded accusations claiming J.M.'s live-in partner had sexually abused one of A.L.A.'s children. It was apparent to the caseworker A.L.A. was experiencing

a mental health episode. The Division became concerned regarding A.L.A.'s condition and homelessness. As a result, the Division removed L.A.A., and placed him with his resource mother, J.F.

The Division filed a complaint under Title 9 and Title 30 for services on May 5, 2016, naming both parents as defendants. At a hearing on May 19, 2016, the Division indicated it was actively searching for M.Z., who it understood was incarcerated in Florida.

After the removal and commencement of the litigation, J.M. stated she was unwilling to care for L.A.A. She cited her health, well-being, and the safety of herself and the two children already in her care. L.A.A.'s paternal grandmother, T.Z., was also interviewed by the Division and L.A.A. was ultimately placed in T.Z.'s home seven days after the removal. However, six days later, T.Z. returned L.A.A. because she did not want to continue interacting with A.L.A. Therefore, L.A.A. was returned to the home of his resource parent, J.F., where he has remained ever since.

At a July 15, 2016 hearing, the Division advised the court it had located M.Z. in a Florida prison. The Division also advised M.Z. declined to complete a paternity test.

A-1991-17T1

In December 2016, A.L.A. was fatally struck by a vehicle. After A.L.A.'s death, the Division contacted J.M. to inquire whether she would serve as a relative placement for L.A.A. J.M. expressed an interest, and the Division arranged for visitation to occur twice weekly. The Division also fostered a relationship between J.M. and J.F. in order to preserve the potential for L.A.A.'s placement with family.

In February 2017, M.Z. was appointed counsel. At a permanency hearing in March 2017, the Division advised its plan was termination of parental rights followed by adoption by J.M. within one year. The judge rejected the Division's plan and ordered bonding evaluations "to get a little bit more information."

At the second permanency hearing held in April 2017, the Division re-proposed a plan of termination of parental rights followed by adoption, pending bonding evaluations and expert reports. The judge approved the revised plan. The Division filed a guardianship complaint on June 2, 2017, and the court terminated the Title 9 litigation. M.Z. was represented by appointed counsel during this time and through the initial hearing in the guardianship matter.

During a case management conference in July 2017, the Division advised the judge it had difficulty serving M.Z. with the guardianship complaint because he had moved between correctional facilities in Florida. However, once M.Z.

6 <span>A-1991-17T1</span>

was served, the attorney who had previously represented him was reappointed. Additionally, the caseworker traveled to Florida to meet M.Z. and make arrangements for his participation in the guardianship proceedings.

The guardianship trial occurred over two days in November 2017. M.Z. appeared by telephone. The Division offered the testimony of forensic psychologists, Drs. Alan Lee and Lina Jeffrey, and caseworker Tara Lange. J.F., J.M., and T.Z. also testified. M.Z. did not.

Dr. Lee had performed an evaluation of M.Z. in Florida. He testified M.Z. had an extensive criminal history, including juvenile charges and two prison terms served as an adult. He also testified M.Z. had admitted he was jailed or detained approximately twenty other times, and had numerous arrests related to drugs, thefts, burglary, or domestic violence.

Dr. Lee concluded M.Z.'s criminal history demonstrated a larger pattern of propensity for criminality and impulse control problems, antisocial behaviors, and a substantial risk of recidivism. Dr. Lee also found M.Z.'s history of polysubstance abuse problematic because he was not fully invested in substance abuse treatment and thus had not benefitted from it. Based on the psychological testing conducted by Dr. Lee, he classified M.Z. as having a "cluster of

<span>A-1991-17T1</span>

antisocial and narcissistic personality traits" which "reflects on his long history of behavior and attitude problems."

Dr. Lee concluded M.Z.'s incarceration prevented him from caring for L.A.A., and his criminal behavior would create an unsafe parenting environment for the child. Dr. Lee opined M.Z. would not be able to parent L.A.A. because he lacked any knowledge of parenting and child rearing, and provided erroneous answers to basic questions regarding a child's common developmental milestones. Dr. Lee testified M.Z. lacked the ability to parent into the future because his potential to show any kind of significant lasting changes as a parent was "poor."

Dr. Jeffrey performed psychological and bonding evaluations of J.M., her partner, and L.A.A. She also conducted separate evaluations of J.F. and L.A.A.

Dr. Jeffrey's diagnostic impression of J.M. indicated she had adjustment disorder, anxiety, and narcissistic tendencies. She found J.M. defensive and exhibiting signs of deception throughout the evaluation. She noted J.M.'s "lack of candor, narcissistic tendencies, . . . lack of personal insight and lack of empathy." J.M. also indicated she experienced stress and anxiety regarding her financial situation and her partner's work schedule, but did not explain why she had been unemployed since 2013.

 A-1991-17T1

J.M. had also provided a written statement, which gave Dr. Jeffrey concern. J.M. explained she called the police when A.L.A. began to act erratically, in order to protect herself, and her other grandchildren, but not L.A.A. Dr. Jeffrey testified this decision showed questionable parental judgment because it was:

> problematic that [J.M.] indicated that her sense . . . [A.L.A.] . . . was off her medication, that she was delusional, and that she was at risk of harm. Whereas, what was . . . reported[] to the police [w]as not that and hence the police did not think that they had the basis [to] arrest . . . [A.L.A.].
>
> I think that the bottom line was the . . . statement "I chose to keep myself, [H.Z.] and [J.Z.][1] safe." She did not choose to keep [L.A.A.] safe.

In other words, despite believing that A.L.A. was having a psychotic episode, J.M. let her leave the house with L.A.A., and did not alert the police to that danger. Dr. Jeffrey concluded this decision was emblematic of J.M.'s emotional immaturity, inability to take responsibility, and adequately problem solve.

Dr. Jeffrey also testified J.M. had a "grandiose sense of self[,]" and placed her needs above others. She testified that J.M.'s narcissistic tendencies and lack of empathy impact her ability to parent L.A.A., because she is likely to prioritize

---

[1] H.Z. and J.Z. are J.M.'s other grandchildren.

A-1991-17T1

her needs above the child's. Dr. Jeffrey opined "a child's most important role model[s are] the primary care givers in a child's life. A child's sense of what an adult is, is derived from their care givers, their parents." Dr. Jeffrey concluded J.M.'s adjustment disorder impacted her ability to parent because it created a lack of stability and an inability to serve as a child's role model.

Dr. Jeffrey also expressed concern regarding J.M.'s intention to parent with her partner because his answers to questions during the bonding evaluation demonstrated he lacked any knowledge regarding L.A.A. Dr. Jeffrey testified that during the bonding evaluation with L.A.A. attended by J.M., her other grandchildren, and her partner, neither J.M. nor her partner attempted to provide structure for the children. Instead, both remained in their chairs throughout the evaluation and J.M. resorted to verbal exhortation to attempt to control the children.

Dr. Jeffrey noted "[L.A.A.] did not display any spontaneous affection to [J.M.]" In the second bonding evaluation, which included only J.M. and L.A.A., Dr. Jeffrey noted there was a lack of greater interpersonal interactions indicative of a bond. She testified J.M.'s behavior indicated she lacked attunement to L.A.A., and L.A.A. did not display spontaneous affection for J.M. Dr. Jeffrey

A-1991-17T1

concluded L.A.A. related to J.M. as a "familiar playmate and a pleasant visitor," but L.A.A. would not suffer a harm if the relationship were severed.

The bonding evaluation between L.A.A. and J.F. was quite different. Dr. Jeffrey's testified J.F. and L.A.A. maintained "good eye contact[,]" and J.F. provided "gentle yet effective" guidance to L.A.A. She also noted L.A.A. was relaxed and comfortable with J.F., used her as a "home base," and remained close in proximity to her as he explored the room. Dr. Jeffrey concluded there was a bond between J.F. and L.A.A., and a severance of the relationship would cause him serious harm and hinder his development.

Dr. Jeffrey testified J.M. would have difficulty mitigating the substantial harm L.A.A. would suffer if his relationship with J.F. were severed because she failed to comprehend the nature of the attachment between L.A.A. and J.F. Dr. Jeffrey found J.M.'s inability to empathize with L.A.A. demonstrated she would not provide the care and support to adequately ameliorate the harm. Dr. Jeffrey opined J.F. had become L.A.A.'s "psychological parent." Therefore, she concluded that a permanent placement with J.F. was crucial to L.A.A.'s development.

J.F.'s testimony corroborated Dr. Jeffrey's findings. She testified L.A.A. refers to her as "mommy" and has formed relationships with her adult daughter,

A-1991-17T1

her extended family, neighbors, friends, and members of J.F.'s church. She expressed an unequivocal desire to adopt L.A.A. and also maintain his relationship with his blood relatives.

J.M. and T.Z. both testified they had not offered themselves as placement options when the case began. J.M. explained she offered herself as placement option only after A.L.A. died, and T.Z. testified she offered herself as a placement only after she was made aware of the Division's plan to terminate parental rights.

The trial judge rendered a comprehensive oral opinion finding the Division had proved the four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, and a termination of parental rights followed by adoption by J.F. was in L.A.A.'s best interests. At the outset, the judge noted the testimony of Drs. Lee and Jeffrey was undisputed. The judge found the experts' testimony that was credible and corroborated by the facts.

Regarding prongs one and two, the judge credited Dr. Lee's testimony M.Z. had a long history of substance abuse and behavioral deficiencies, which prohibited him from parenting at the time or in the foreseeable future. The judge noted, although M.Z.'s expected release date from prison was December 2020,

his drug use and behavioral disorders prevented him from adequately parenting even if he were released on time.

With respect to prong three, the judge credited the caseworker's testimony, and found the Division had met its burden to make reasonable efforts to reunify the family by offering services to both parents. The judge noted M.Z. had been provided services by the Division in connection with the removals of his other children, namely, "parenting [classes], anger management, and counseling." However, the judge found M.Z. had never asked for services after his incarceration.

The judge also concluded the Division had satisfied its burden to prove by clear and convincing evidence there were no alternatives to termination of parental rights and had assessed relative placements. The judge noted although the Division is required to assess relative placements, there was no presumption in favor of placing the child with relatives. Citing to <u>N.J. Div. of Youth & Family Servs. v. M.F.</u>, 357 N.J. Super. 515 (App. Div. 2003), the judge found "a presumption of custody only exists in favor of a natural parent as opposed to placement with relatives or foster parents."

The judge noted it was undisputed J.M. was not interested in caring for L.A.A. when the Division took emergency custody of him and inquired whether

she was available for placement. J.M. had allowed L.A.A. to leave with A.L.A. despite her knowledge of A.L.A.'s housing instability and concerns for the child's safety. The judge also noted T.Z. took custody of L.A.A. for six days before giving him up for placement with the resource parent. The record indicated neither J.M. nor T.Z. had communicated with the Division for a period of ten months while L.A.A. was placed with J.F. The judge found these facts supported the conclusions drawn by Dr. Jeffrey, that J.M. had a sense of entitlement, self-absorption, and lacked compassion, attunement, and the ability to mitigate the harm to L.A.A., which would result from severing his relationship with J.F.

Notwithstanding, the judge found the Division still arranged for visitation once J.M. indicated her interest in becoming a placement option for L.A.A. The judge credited the Division's efforts to preserve the family by securing bonding and psychological evaluations to determine the viability of a relative placement.

However, the judge found J.F. was the only viable permanency option for L.A.A. The judge found she placed L.A.A. interests above her own, and had a substantial support system and experience caring for foster children. Notably, although the judge found both J.M. and J.F. reported anxiety and depression

A-1991-17T1

during their evaluations, she concluded only J.F. was committed to engaging in counseling and treatment.

The judge concluded the fourth prong had been met because L.A.A. had been placed with a stable and nurturing psychological parent. The judge found L.A.A. had a significant attachment to J.F. and would be harmed by severing the relationship, which would not meet the statutory goals of ensuring the physical and psychological well-being of the child. The judge concluded the only means of assuring L.A.A. permanency and healthy development was to terminate M.Z.'s parental rights.

The judge granted the Division guardianship. This appeal followed.

I.

"Appellate review of a trial court's decision to terminate parental rights is limited[.]" In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). "Because of the Family Part's special jurisdiction and expertise in family matters, we accord particular deference to a Family Part judge's fact-finding." N.J. Div. of Youth & Family Servs. v. T.M., 399 N.J. Super. 453, 463 (App. Div. 2008); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). Deference is appropriate because the trial judge has a "'feel for the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552

(2014). A reviewing court will not disturb a family court's termination of parental rights so long as the decision is "supported by substantial and credible evidence on the record." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citations and internal quotations omitted).

"When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support." N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 259 (2005) (citing In Re Guardianship of DMH, 161 N.J. 365, 382 (1999)). In other words, a family court decision is overturned only when the fact-findings are "so wide of the mark that [the Appellate Division's] intervention is necessary to correct an injustice." F.M., 211 N.J. at 447. The factual findings of the trial court should not be disturbed on appeal unless "they are so wholly insupportable as to result in a denial of justice[.]" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (citing Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). When the trial court's findings are "supported by adequate, substantial and credible evidence" those findings should be upheld on appeal. Ibid.

A-1991-17T1

On appeal, M.Z. argues he was deprived of counsel at the Title 9 stage of the proceedings, which in turn deprived him of the ability to advocate for L.A.A.'s placement with family rather than a resource parent. M.Z. claims he was prejudiced because he was not produced from jail to attend the trial. He contends his counsel was ineffective for failing to advocate for him at the Title 9 stage and avoid the guardianship filing. He also claims his counsel was ineffective in the guardianship phase for failing to pursue a bonding evaluation between the child and J.M., and for failing to advocate for adoption by J.M. M.Z. also challenges the judge's prong three findings, claiming the Division made minimal efforts to facilitate his participation in the trial, involve J.M. and T.Z. in the case, and pursue a permanency placement with relatives.

II.

We first address M.Z.'s claims he was deprived of counsel during critical stages of the proceedings, was not produced to attend court, and that his counsel was ineffective. At the outset, we note these arguments are raised for the first time on appeal. Generally, "issues not raised below will ordinarily not be considered on appeal unless they are jurisdictional in nature or substantially implicate the public interest." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 339 (2010) (citing Cty. of Essex v. First Union Nat'l Bank, 186

A-1991-17T1

N.J. 46, 51 (2006)); see also Neider v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

Notwithstanding, we are unpersuaded M.Z.'s claims warrant reversal of the judgment. In N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301 (2007), our Supreme Court adopted the two-part test for assessing ineffective assistance of counsel from Strickland v. Washington, 466 U.S. 668 (1984). This test establishes:

> (1) counsel's performance must be objectively deficient—i.e., it must fall outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance must prejudice the defense—i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."
>
> [192 N.J. at 307 (quoting Strickland, 446 U.S. at 694).]

M.Z. argues the deprivation of counsel is presumed to be prejudicial, and therefore negates the requirement to prove the second prong of the Strickland standard. Specifically, he relies upon United States v. Cronic, 466 U.S. 648 (1984); State v. Miller, 216 N.J. 40 (2013); and United States v. Gonzalez-Lopez, 548 U.S. 140 (2006).

M.Z. also relies upon In re Guardianship of M., 158 N.J. Super. 585 (J. & D.R. Ct. 1978). In M. the court voided a parent's voluntary surrender, entered

after the guardianship complaint was filed, where the Division negotiated the surrender without the parent's attorney present. 158 N.J. Super. 593-94. The court noted it was not convinced the parent made a knowing and intelligent waiver of her constitutional right to counsel. Id. at 593. The court described the parent's frailties, and stated she:

> [wa]s blind. Alcohol has been a problem for her. . . . she had difficulty when walking and negotiating the steps to the witness stand even with assistance, and her hands were constantly shaking as if in a tremor. From her testimony and demeanor it was obvious that she was not a very intelligent woman.
>
> [Ibid.]

The court also noted the Division had direct contact with the parent over her counsel's objection. Id. at 593-94. The court stated this "conduct may itself be a sufficient overriding equitable consideration so as to invalidate the signing of the [s]urrender [c]onsent form." Id. at 594.

M.Z.'s circumstances are far different and do not persuade us there was a presumptive prejudice. Indeed, M.Z. does not suffer from the various deficits outlined by the court in M. Although M.Z. was without counsel for the majority of the Title 9 proceedings, it was because he was not the target of the litigation. Moreover, because A.L.A. was alive and M.Z. was incarcerated, the Division's goals were reunification with A.L.A. Once it became obvious reunification with

19

A.L.A. was not a possibility, and when she died, M.Z. was assigned counsel and remained represented throughout the litigation and its most critical phases.

M.Z. argues <u>New Jersey Division of Youth and Family Servies v. R.G.</u>, 397 N.J. Super. 439 (App. Div. 2008) is dispositive. We disagree. In <u>R.G.</u> the trial court held a fact finding hearing, heard a dispositive motion, and adjudicated that the parent had committed abuse or neglect—all before the parent had been appointed counsel. <u>Id.</u> at 444-45. The parent's only ability to confer with counsel was an informal discussion with a public defender who happened to be present in the courtroom. <u>Ibid.</u> Although we found these conditions warranted a reversal of the abuse and neglect finding, we did not, as M.Z. contends, decide the matter under the prejudice prong of the <u>Strickland</u> test. <u>Id.</u> at 450.

Moreover, the parent in <u>R.G.</u> was the target of the Title 9 proceedings, and was deprived of counsel at the most critical fact-finding phase of the case. M.Z.'s circumstances were much different. He was able to consult with his attorney at all critical points of the litigation. He was represented when the court dismissed the Title 9 litigation, and the dismissal occurred without an adjudication of abuse or neglect against either parent. Thus, <u>R.G.</u> is inapposite,

and the circumstances presented do not support a finding of a presumption of prejudice.

M.Z. also relies upon In re Adoption of J.E.V., 226 N.J. 90 (2016), where the Supreme Court mandated the appointment of counsel for a biological parent who could not afford an attorney in a contested private adoption. Id. at 108. The Court held reversal of the judgment of adoption was required where "a complete denial of counsel casts doubt on the fairness of the process followed." Id. at 115 (citing State v. Shirley E. (In re Torrance P.), 724 N.W.2d 623 (Wis. 2006)). Again, for the reasons we have previously expressed, the circumstances of J.E.V. are wholly dissimilar from the facts presented here. There was no "complete deprivation" of counsel for M.Z. Instead, the judge took special care to assure the appointment of the same attorney for M.Z. in both the Title 9 and guardianship phases of the litigation. For these reasons, we decline to find a presumption of prejudice requiring us to obviate a consideration of the second Strickland prong.

M.Z. asserts the deprivation of counsel during the Title 9 proceedings prior to A.L.A.'s death, during the period between the Title 9 dismissal and the initiation of the guardianship matter, all prevented him from influencing the future of the case. Specifically, M.Z. asserts if he had been included in the Title

9 litigation, he would have advocated for greater participation by T.Z. and J.M., and against L.A.A.'s placement in a resource home. We are unpersuaded.

Not only was there the lack of presumption of prejudice on M.Z.'s behalf, the facts do not support a finding of actual prejudice, and thus, a reason to disturb the guardianship judgment. Indeed, as we noted, M.Z. was incarcerated throughout the Title 9 litigation and the Division's objective was reunification with A.L.A. Nothing in the record indicates reunification was not possible prior to A.L.A.'s death. When A.L.A. passed away, M.Z. was represented by counsel at two hearings, which ultimately resulted in dismissal of the Title 9 matter without a determination of abuse or neglect. There is no dispute M.Z. was represented by counsel throughout the Title 30 litigation. Additionally, he was produced telephonically from prison in Florida and participated in the proceedings.

In N.J. Div. of Youth & Family Servs. v. A.P., 408 N.J. Super. 252, 255 (App. Div. 2009), we addressed whether "a parent's appeal of an order that dismisses a Title 9 action brought by the Division . . . before . . . an adjudication of abuse or neglect and entry of a final order of disposition is mooted by the Division's filing of a Title 30 action for termination of parental rights." We noted Title 9 and Title 30 matters are separate proceedings and the Division may

file a Title 30 action without filing a Title 9 complaint or having obtained a finding of abuse or neglect. Id. at 259-60 (citations omitted).

We also discussed the significance of a dismissal of a Title 9 action without an adjudication regarding abuse or neglect.

> [The Division]'s dismissal of a Title 9 action without an adjudication that the parent has abused or neglected his or her child has none of the adverse consequences of a final order of disposition based on a finding of abuse or neglect. Such a disposition, like the dismissal of any other action by a plaintiff under Rule 4:37-1, "adjudicates nothing," Malhame v. Borough of Demarest, 174 N.J. Super. 28, 30 (App. Div. 1980) (quoting Christiansen v. Christiansen, 46 N.J. Super. 101, 109 (App. Div. 1957)), and thus cannot provide a predicate for relief against the defendant. Moreover, the voluntary dismissal of an action "leaves the situation so far as procedures therein are concerned the same as though the suit had never been brought, thus vitiating and annulling all prior proceedings and orders in the case." A.B. Dick Co. v. Marr, 197 F.2d 498, 502 (2d Cir. 1952); accord Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers, 915 F.2d 43, 48 (1st Cir. 1990).
>
> [Id. at 262-63.]

Thus, we held the appeal was moot under the circumstances presented, and emphasized the parent's due process rights would be fully protected by the trial of the Title 30 action. Id. at 264. We stated a Title 30 trial would:

> afford . . . the opportunity . . . to contest the charges of abuse or neglect or other harm to the child caused by

23

the parental relationship, [the parent]'s willingness and ability to address the causes of that harm, the adequacy of remedial services [the Division] provided . . . , and whether termination of . . . parental rights . . . would do more harm than good. Moreover, [the Division] will bear the burden of establishing the standards for the termination of parental rights by "clear-and-convincing-evidence" rather than the lesser burden of proof by a "preponderance of the evidence" that would apply in an action under Title 9.

[Id. at 264 (citing K.M., 136 N.J. at 557).]

Here, M.Z. did not appeal from the dismissal of the Title 9 litigation. Regardless, because the Title 9 dismissal "adjudicate[d] nothing[,]" it had no prejudicial effect on M.Z.'s rights in the guardianship proceeding. As we noted, at the outset of the guardianship matter, the judge obtained the necessary information for M.Z. to complete an application for the appointment of counsel, and he was provided the same public defender who represented him during the Title 9 proceedings. The Division sent a caseworker to Florida to meet with M.Z. to discuss the case and arrange for his participation in the trial. M.Z.'s trial counsel represented him throughout the guardianship matter and M.Z. participated in the proceedings. At trial, M.Z.'s counsel offered a vigorous defense of the Division's case, cross-examined its experts, and adduced testimony from the T.Z. and J.M. in support of M.Z.'s defense. M.Z. does not contest these facts.

Furthermore, the record clearly indicates the Division had involved T.Z. and J.M. from the onset of the litigation. As we noted, the Division contacted J.M. immediately after L.A.A.'s removal and she indicated she was not interested in caring for the child. The Division placed L.A.A. with T.Z. for a brief period, but she indicated she no longer wanted to be considered as a placement option. It was only after A.L.A.'s death and approval of the Division's permanency plan of a termination of parental rights followed by adoption that either T.Z. or J.M. expressed a serious interest in caring for L.A.A. Even then, the Division was responsive and engaged J.M. with a visitation schedule and multiple evaluations to determine whether a placement with her was viable.

Moreover, despite M.Z.'s contention that the disposition of the Title 9 matter made the guardianship litigation a formality, the record indicates the Division's plan was adoption by J.M. The record demonstrates the permanency plan changed after the Title 30 proceedings commenced and expert evaluations were submitted—not during the transition from the Title 9 proceedings into the guardianship. M.Z. was represented by competent counsel and was fully capable of defending the guardianship and advocating for L.A.A.'s placement with a grandparent. The facts do not support M.Z.'s claim the Division had not thoroughly vetted and sought a placement with T.Z. or J.M. early in the

25

proceedings, or that M.Z.'s advocacy for a relative placement at some unknown point before A.L.A.'s death would have changed the trajectory of the litigation.

The record lacks evidence of an ineffective assistance of counsel to meet either prong of the Strickland standard. To the extent we have not further addressed M.Z.'s arguments on this account, it is because they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

## III.

Finally, we address M.Z.'s claims the Division failed to prove the third prong of the best interests test. M.Z. argues the Division failed to meet its burden to make reasonable efforts to provide services and did not adequately assess relative placements in violation of its statutory burden. M.Z. argues the clear and convincing standard requires proof the Division made reasonable efforts to help the parent remedy the problems leading to the child's removal. He alleges the Division ignored him until shortly before the trial, ignored T.Z.'s interest in being a placement option for L.A.A., and failed to assist J.M. in remedying the parenting deficiencies cited by Dr. Jeffrey.

Under N.J.S.A. 30:4C-15.1(a), the Division must prove by clear and convincing evidence termination is in the best interest of the child. F.M., 211 N.J. at 447. The clear and convincing evidence standard is satisfied when, in

the mind of the factfinder, there is a "firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the precise facts in issue." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 168 (2010) (quoting In re Seaman, 133 N.J. 67, 74 (1993) (citation, internal quotation and editing marks omitted)).

Pursuant to the "best interest of the child" standard, the Division must prove by clear and convincing evidence:

(1)    The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2)    The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm.  Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3)    The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4)    Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

"Importantly, those four prongs are not 'discrete and separate,' but 'relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests.'" N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 606-07 (2007) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

Under prong three, the court must consider whether the Division "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[.]" N.J.S.A. 30:4C-15.1(a)(3). The Division's efforts must be analyzed "with reference to the circumstances of the individual case[,]" including the parent's degree of participation. In re Guardianship of DMH, 161 N.J. at 390 (citing In Re Tricia & Trixie H., 126 N.H. 418 (1985)).

N.J.S.A. 30:4C-15.1(c) defines diligent efforts as those "attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure[.]" The statute lists examples of "reasonable efforts" at reunification, including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development and health; and

(4) facilitating appropriate visitation.

[Ibid.]

Further, "[the Division]'s efforts in providing [services] must by their very nature take into consideration the abilities and mental conditions of the parents[,]" but the determination of reasonableness does not turn on the success of those efforts. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 442 (App. Div. 2001).

Relative placement is among many of the resources available to the Division to satisfy its reasonable efforts obligation. Although there is no presumption of favorability for relative placements, the assessment for such placements help the Division demonstrate its reasonable efforts at family reunification. See N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580-81 (App. Div. 2011). Additionally, while kinship legal guardianship (KLG) is an alternative to termination of parental rights, it is only available where the relative is unwilling to adopt. Id. at 579; see also N.J. Div.

of Youth & Family Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011) ("[W]hen a caregiver in a case brought by the [Division] unequivocally asserts a desire to adopt, the finding required for a KLG that 'adoption of the child is neither feasible nor likely' cannot be met."); N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512-13 (2004) (where our Supreme Court stated KLG should only be considered when adoption is not an option). "If the [Division] determines that the relative is unwilling or unable to assume the care of the child, the [Division] shall not be required to re-evaluate the relative." N.J.S.A. 30:4C-12.1(b).

We reject M.Z.'s claims the third prong of the best interests test was not met. There is no credible dispute M.Z. had not met L.A.A., played no role in his life, and was incapable of parenting the child at any point during the litigation or into the foreseeable future. Moreover, the record clearly demonstrates the Division engaged A.L.A. with services aimed at reunification when she was the only parent available to care for L.A.A. due to M.Z.'s incarceration.

When the removal occurred, the Division immediately sought a relative placement with T.Z. and J.M., who for different reasons each declined the opportunity to be considered as placement options. When A.L.A. died and J.M.

requested consideration as a placement option, the Division supported this request by establishing a reasonable visitation schedule and multiple evaluations to determine whether placement with J.M. was a viable option. The Division engaged J.M. even though it had previously determined she was unwilling to care for the child and was no longer statutorily required to consider her as a placement option.

M.Z.'s argument also ignores the fact the Division assessed all available relative placements and ruled them out because they were not viable parenting options pursuant to the undisputed expert testimony. Indeed, Dr. Jeffrey testified without rebuttal that J.M. suffered from behavioral deficiencies, had narcissistic tendencies, and possessed no psychological connection with L.A.A. The expert testimony proved J.M. suffered from adjustment disorder and would be unable to mitigate the substantial harm L.A.A. would suffer if his relationship with J.F. were severed.

The record amply supports the trial judge's prong three findings. Moreover, the judge's findings as a whole are supported by substantial credible evidence to warrant granting the judgment of guardianship.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1991-17T1