# RECORD IMPOUNDED

> **NOT FOR PUBLICATION WITHOUT THE**
> **APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3318-17T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

B.C.R.,

      Defendant-Appellant,

and

J.L.N.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.C.J.N.,

      a Minor.

_____

Submitted December 12, 2018 – Decided December 27, 2018

Before Judges Alvarez and Mawla.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0048-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Phuong V. Dao, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa D. Schaffer, Assistant Attorney General, of counsel; Melvina D. Fennell, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith A. Pollock, of counsel; Phyllis G. Warren, Designated Counsel, on the brief).

PER CURIAM

B.C.R. (Betty[1]) appeals from a March 9, 2018 judgment terminating her parental rights to her son J.C.J.N. (John). We affirm.

We take the following facts from the record. Betty has had a history of involvement with the Division of Child Protection and Permanency (Division), beginning in 2002, with the birth of her first child. At the time, a psychological evaluation conducted on behalf of the Division concluded Betty could not adequately parent her child because she was emotionally disturbed, had developmental and emotional delays, and was communication-impaired.

---

[1] We utilize fictitious names to protect the parties' privacy.

Another psychological evaluation performed in July 2007, showed little change in Betty's condition and concluded she had a poor prognosis because she was incapable of controlling her emotions and her anger. Betty was evaluated by five other professionals, all of whom drew similar conclusions.

John was born to Betty and J.L.N. (Jim) in February 2016. The Division received a referral the day after John's birth because he was born premature at twenty-nine weeks gestation, weighed three pounds and ten ounces, and both he and Betty had tested positive for cannabis. At the hospital, Betty was aggressive and irritable and declined to take the medicine prescribed for her. John was placed in the neonatal intensive care unit for treatment and monitoring.

Betty revealed she had smoked cannabis and cigarettes throughout her pregnancy, and did not receive prenatal care. She also indicated she had been diagnosed with schizo-affective disorder. Betty claimed she self-medicated with cannabis because she did not like the effects of the medicine prescribed for her. She continued to smoke cannabis after her discharge.

In March 2016, a caseworker reported Betty admitted to using cannabis and appeared to be in need of mental health treatment. The Division also became concerned about Betty's potential housing instability because the caseworker noted she had not purchased a bed or any supplies for John. Betty claimed Jim

did not care for John and only saw him as a means to receive government benefits. Betty offered several excuses as to why Jim's family could not care for John, including her claim their house was infested with bedbugs.

On March 15, 2016, the Division filed a verified complaint for custody, which the court granted. John was placed in a resource home and the Division provided weekly visitation for Betty. The Division referred Betty for substance abuse and psychological evaluations, which were scheduled for March and April, but she did not attend either appointment. Betty did attend a substance abuse evaluation, scheduled in March 2016, with a counselor from Child Protection Substance Abuse Initiative. There, she tested positive for cannabis. As a result of the evaluation, Betty was recommended to an outpatient substance abuse treatment program at Catholic Charities Family Growth Program in May 2016, but was discharged two months later for lack of compliance.

Betty's statements and conduct in the presence of Division caseworkers demonstrated she labored with mental illness. Betty claimed the Division had changed her name and birth date because it did not want to obtain the true information from a military base. She claimed her father was smothered by a pillow while at a hospital and implicated her previous Division caseworker in the death of her family members. Betty claimed cancer could be treated with a

plant purchased at Home Depot. A caseworker reported Betty ambulated in an unusual way while being transported to a visit with John, although she had no prior problems with walking. When they arrived for the visit Betty stood silently and stared at John. In June 2016, a caseworker reported Betty acted erratically during transport, holding her keys in a threatening stabbing manner while she sat in the passenger seat of the vehicle.

Betty continued not to comply with evaluations arranged by the Division. The Division provided bus passes for transportation to psychological evaluations in June and August 2016, but she failed to attend. Betty claimed she missed some of her appointments because she did not feel like attending.

In July 2016, Betty tested positive for cannabis when she arrived for visitation. She ignored a court order which required she maintain sobriety in order to have visitation. Betty also refused to attend court ordered anger management and parenting classes. She claimed she would attend only after the Division refunded money she believed she was owed.

During a visit in September 2016, Betty became verbally abusive with Division staff and threatened to shoot a security guard. The court ordered that visitation would not resume "until [Betty] complete[d] [a] psychological and a psychiatric evaluation for medication due to her mental health issues."

A-3318-17T4

In 2017, Betty was referred for a psychological evaluation, which found she suffered from: psychotic disorder not otherwise specified; history of major depressive disorder, severe with psychotic disorder; intermittent explosive disorder; rule/out delusional disorder; cannabis use disorder; borderline intellectual functioning; unspecified personality disorder, paranoid, antisocial and borderline features. The report also concluded Betty was not capable of parenting John, nor could she safely resume visitation. The evaluator concluded:

> [Betty's] visits were discontinued due to her volatile behavior and refusal to take redirection. Nothing has taken place since her visits were suspended that would lead her behavior to change. She continues to endorse physical discipline, she has an extremely high score on the Child Abuse Potential Inventory, she has very low scores on the parenting inventory and refuses to take any feedback about her parenting, she does not understand what structure is or what the importance of it is in raising children, she did not acknowledge that [John] has any special needs when asked about parenting him and also made very unusual statements such as it would be acceptable for her children to rob a local store with a gun.

The report further indicated "[a] prior psychological evaluation [performed] . . . on July 29, 2009[,] stated that 'her prognosis is at best guarded and most likely poor.' In 2017 this remains the case. It is not likely that she will ever be able to independently or safely care for a child."

6

The Division referred Betty for a substance abuse evaluation. She failed to attend three scheduled appointments and the evaluator closed the case.

The Division arranged for Betty to attend a psychological evaluation with Barry Katz, Ph.D. After the initial session, Dr. Katz opined that Betty displayed delusional and psychotic thinking, it was unsafe to resume visitation, and recommended partial hospitalization. At the conclusion of a different session in November 2017, Dr. Katz informed the Division Betty had stated she possessed machine guns she obtained while she was in the military, a claim she had also made to another evaluator. However, there was no evidence Betty had ever served in the military.

Dr. Katz's report concluded Betty "presented as highly agitated, irrational and volatile." She "intermixed racial slurs with irrational, paranoid and nonsensical statements. [She] expressed recurring themes that she did not have the patience or time to meet, that she was being exploited, [and] that [the Division's involvement] was a conspiracy[.]" Dr. Katz's opined as follows:

> Across interviews, [Betty] presented as in the throes of an active psychotic episode. [Betty] displayed impaired reasoning, impaired judgment, delusional ideation and thought disorder. [Betty] was impaired in her ability to control her impulses and continually appeared on the verge of becoming overwhelmed. [She] showed evidence of a thought disorder and was frequently on the verge of losing control of her anger

7

. . . . [Her] anger toward the paternal family equaled her anger toward the Division and those she believed aligned with [the Division]. [Betty] made delusional accusations in general of pedophilia and various other criminal behavior and exploitive behavior. [She] would repeatedly show loss in functioning, self-control and reality when questioned about parenting, her past, her paramour, her situation and her children. [Betty] presented with this same impaired state across interviews. The [Division] worker and [the Division] staff reported observing similar behaviors by [Betty] over many instances. These problems in function were also noted throughout the record with origins in early adolescence.

[Betty] was steadfast in her commitment not to comply with medication, treatment and any other services. This pledge on the part of [Betty] was reflected in her ongoing behavior as was reported in the record. [She] not only expressed her desire not to comply with any services during the interview, but the record indicates that [she] has been chronically noncompliant with services, including therapy and medication.

. . . .

[Betty] displayed loss of control of her emotions and cognition during the current assessment. [She] displayed poor frustration tolerance that was repeatedly on the brink of explosive outbursts that would be fueled by internal psychotic processes and cognitive distortion. This behavior during the interview is consistent with the reports in the record of [Betty] having loss of functioning along with psychotic and/or explosive behaviors. This has led to [Betty] having her visits suspended. Such behaviors would put others at risk, especially a vulnerable child.

The report also stated Betty's chronically impaired condition would likely cause her to act out in violent impulses, and concluded she would likely act violently toward a child in her care. Dr. Katz found a child in Betty's care would be at imminent risk of harm and she would be unable to care for a child in the foreseeable future. He recommended visitation be suspended.

In August 2017, Betty and John attended a bonding evaluation with Dr. Katz. John did not make eye contact with Betty during the observation, and instead looked around the room and out the window with a concerned expression. John rested his head against Betty, but peered through the window or looked directly at Dr. Katz. John had a "flat affect" and looked somber and withdrawn. Dr. Katz observed that when Betty put John down he did not cry, and when she picked him up he continued to display a concerned expression. He also noted John did not reciprocate the affection displayed by Betty.

Dr. Katz also conducted a bonding evaluation with the resource parent. The resource parent provided a complete history of John's placement, and provided a detailed description of his medical and developmental history. John smiled and laughed with the resource parent during the observation, and seemed excited and joyful. He also noted John crawled around the room and generally exhibited a full range of emotion.

Dr. Katz concluded John did not have an attachment to either of his biological parents and did not recognize them. He concluded the resource parent was John's primary parent and he would not suffer a significant harm if Betty's parental rights were terminated. Rather, Dr. Katz found John would suffer a substantial harm if his relationship with the resource parent was severed, and concluded Betty was incapable of remediating such harm.

The record demonstrates John's brain had not fully developed in utero and he will likely remain mentally challenged throughout his life. He presently has numerous developmental challenges and issues hearing, seeing, walking, and feeding. He has required treatment from specialists including a neurologist, a nutritionist, an occupational therapist, a physical therapist, and an ear, nose, and throat specialist.

The guardianship trial took place in February and March 2018. The Division presented testimony from Dr. Katz and the caseworker, Monique Ford. Betty testified on her own behalf and presented no other testimony.

Ford's testimony explained the Division's involvement since the removal, its assessment of relative placements, the services provided to the family, and John's progress in his resource home, as we have summarized it. Dr. Katz was

qualified without objection as an expert in the field of psychology, and testified consistent with the conclusions in his psychological and bonding evaluations.

Dr. Katz's conclusions explained Betty's prognosis. He testified she likely suffered from mental impairment since adolescence, and the disorder was progressing and worsening over time. He opined the combination of Betty's psychotic disorder, propensity for violence, and poor understanding of parenting responsibilities would put John at a high risk of danger because she was incapable of parenting him. Dr. Katz concluded there was an "imminent risk of severe harm leading to potential catastrophic consequences for the child."

Dr. Katz linked Betty's conduct with the harms John had suffered. He testified because John will potentially struggle with his developmental delays throughout his lifetime, he required a parent with knowledge of the delays who was capable of addressing them. Dr. Katz explained his findings by referencing Betty's poor track record. He noted John had lost hearing in one ear because of Betty's failure to consent to ear surgery. Betty's delusional thinking placed John at significant risk of harm if he were left to her care. Additionally, Dr. Katz opined John would potentially experience bouts of anger, depression, maladjustment, or regression if his relationship with the resource parent were severed, which Betty could not remediate because of the lack of a bond.

Betty's testimony blamed the Division for failing to provide services. Despite the lack of evidence, she claimed both she and John had autism, which the Division failed to treat. She further asserted the Division abused her and generally abuses autistic and deaf children. Betty claimed the Division did not compensate her for a radiation test and owed her millions of dollars. She testified her plan to parent John was to have him returned to her care, and to "let him know that he got the problem."

The trial judge delivered an oral decision on March 9, 2018. The judge reviewed Betty's extensive history with the Division and the services it offered her following the birth of her first two children. The judge credited Ford's testimony regarding the services offered to Betty after John's birth. The judge accepted the extensive findings made by Dr. Katz, which she noted were unrebutted. The judge concluded the Division had proven all four prongs of the best interest of the child test, codified in N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence.

With respect to prongs one and two, the judge found Betty had harmed John by failing to provide a caring family for him. The judge noted Betty did not maintain stable housing and failed to obtain parenting necessities when John was born. She also found Betty's severe mental health problems prevented her

from understanding or meeting John's special needs. The judge also noted Betty had harmed John by failing to seek prenatal care or treatment for her own mental health issues, and instead resorting to drug use.

The trial judge recounted Betty's erratic and abusive behavior during visits, which caused them to be canceled. She also concluded Betty had not demonstrated she could provide a safe and stable home for John or remedy the issues which caused the removal. The judge credited Dr. Katz's testimony, which highlighted the high risk of severe and enduring harm John would suffer if he were removed from this resource parent.

As to prong three, the judge found the Division made reasonable efforts to provide services to Betty to remedy the circumstances which led to John's removal. The judge found Betty only minimally complied with services. She found the Division met its burden to consider alternatives to termination, citing the Division's initial plan of reunification with Betty and the Division's continued provision of services to her despite her unwillingness to comply. The judge also found the Division had conducted a sufficient investigation of relative resources, but determined none were suitable.

The trial judge found the Division had proven prong four. She concluded a termination of parental rights would not do more harm than good because Betty

13

had no plan to care for John and address his developmental needs. The judge found Betty incapable of parenting because of her untreated mental health issues. She concluded Betty's conduct and testimony reinforced Dr. Katz's determinations regarding Betty's inability to parent. Noting the respective bonding evaluations performed by Dr. Katz, the trial judge concluded the resource parent understood and met all of John's developmental needs and was willing to adopt him.

The judge signed a judgment terminating the parental rights of both Betty and Jim to John. Jim did not file an appeal. This appeal by Betty followed.

I.

"Appellate review of a trial court's decision to terminate parental rights is limited[.]" In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). "Because of the Family Part's special jurisdiction and expertise in family matters, we accord particular deference to a Family Part judge's fact-finding." N.J. Div. of Youth & Family Servs. v. T.M., 399 N.J. Super. 453, 463 (App. Div. 2008) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Deference is appropriate because the trial judge has a "'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196

N.J. 58, 104 (2008)). A reviewing court will not disturb a family court's termination of parental rights so long as they are "supported by 'substantial and credible evidence' on the record." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

"When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support." N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 259 (2005) (citing In re Guardianship of DMH, 161 N.J. 365, 382 (1999)). In other words, a family court decision is overturned only when the fact-findings are "so 'wide of the mark' that [the Appellate Division's] intervention is necessary to correct an injustice." F.M., 211 N.J. at 448 (quoting E.P. 196 N.J. at 104). The factual findings of the trial court should not be disturbed on appeal unless "they are so wholly unsupportable as to result in a denial of justice." In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). When the trial court's findings are "supported by adequate, substantial and credible evidence[,]" those findings

should be upheld on appeal. Ibid. (quoting Rova Farms Resort, Inc., 65 N.J. at 484).

On appeal, Betty challenges the trial court's findings under prong one, three, and four. As to prong one, she argues there was no evidence presented showing her mental health and drug use harmed John. As to prong three, she contends the Division failed to meet its reasonable efforts mandate because she did not receive sufficient visitation and the Division failed to help her enroll in a recommended partial hospitalization program. As to prong four, she claims she did not harm John when she interacted with him, and therefore, the Division did not establish it would be more harmful than not to terminate parental rights.

## II.

"A parent's right to enjoy a relationship with his or her child is constitutionally protected." In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999) (citations omitted). However, this protection "is tempered by the State's parens patriae responsibility to protect the welfare of children." Id. at 347 (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)); see N.J.S.A. 30:4C-1(a).

Under N.J.S.A. 30:4C-15.1(a), the Division must prove by clear and convincing evidence termination is in the best interest of the child. F.M., 211

N.J. at 447 (citing N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 113 (2011)). Our Supreme Court has determined the clear and convincing evidence standard is satisfied when, in the mind of the factfinder, there is a "firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the precise facts in issue." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 168 (2010) (quoting In re Seaman, 133 N.J. 67, 74 (1993) (citation, internal quotation and editing marks omitted)). "Because of the elemental nature of the parent-child relationship, and recognizing that the severing of that relationship is among the most 'severe and . . . irreversible' forms of state action," E.P., 196 N.J. at 102 (quoting Santosky v. Kramer, 455 U.S. 745, 759 (1982)), courts "consistently impose[] strict standards for the termination of parental rights" and "all doubts must be resolved against termination of parental rights." K.H.O., 161 N.J. at 347 (citations omitted). The issue under the statute is "the 'best interests of any child,' not simply the presence or absence of culpable fault" on the part of the parent. In re Guardianship of R., 155 N.J. Super. 186, 195 (App. Div. 1977) (quoting N.J.S.A. 30:4C-15(c)).

Under the "best interest of the child" standard, the Division must prove by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

"Importantly, those four prongs are not 'discrete and separate,' but 'relate to and overlap with one another to provide a comprehensive standard that identifies [the] child's best interests.'" N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 606-07 (2007) (quoting K.H.O., 161 N.J. at 348).

## A.

We reject Betty's argument that she did not harm John through her conduct. Under prong one, the Division must prove a harm to the child exists, and that the harm is "one that threatens the child's health and will likely have continuing deleterious effects on the child." M.M., 189 N.J. at 281 (quoting K.H.O., 161 N.J. at 352). The harm need not be physical, as "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parent[] can constitute injury sufficient to authorize a termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing J.C., 129 N.J. at 18). The focus of the harm is not on any isolated incident, but rather "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. "Moreover, '[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect'" before acting. Dep't of Children & Families v. E.D.-O., 223 N.J. 166, 178 (2015) (quoting DMH, 161 N.J. at 383). Prong one may be satisfied where a parent exposes the child to the risk of future harm. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001).

Betty's arguments are not supported by the record. The trial judge found her inability to provide a safe and stable home for John, her severe and untreated mental health issues, and continued use of drugs put John at a substantial risk of harm. Betty's erratic conduct during the Division's involvement in this case proved Dr. Katz's findings she had not improved, could not address her mental health problems, and would continue to harm John. As Dr. Katz noted, Betty was likely to act out in violent impulses due to her psychotic disorder and inability to control her emotions. This was problematic because John's developmental delays made him more vulnerable to harm.

Moreover, Betty's reliance on N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 330-31 (App. Div. 2011), a case in which we held illicit drug use does not automatically support a finding of abuse and neglect, is misplaced. V.T. is inapposite because here the Division's case and the judge's findings under prong one did not find harm to John relying solely on Betty's drug use. Rather, the judge considered the fact Betty smoked cannabis during her pregnancy, continued to abuse it afterwards, refused to comply with substance abuse treatment services, exhibited aggressive and erratic behavior indicative of the lack of treatment, and failed to maintain a stable home.

The trial judge's prong one findings were supported by substantial credible evidence in the record.  For these reasons, we decline to disturb them.

B.

We also reject Betty's challenges to the judge's prong three findings.  Under prong three, the court must consider whether the Division "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home."  N.J.S.A. 30:4C-15.1(a)(3).  The Division's efforts must be analyzed "with reference to the circumstances of the individual case," including the parent's degree of participation.  DMH, 161 N.J. at 390.

N.J.S.A. 30:4C-15.1(c) defines "reasonable efforts" as "attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure."  The statute sets forth examples of "reasonable attempts" at reunification, including, but not limited to:

> (1)     consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2)     providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

21

> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [Ibid.]

Further, "the Division's efforts in providing classes and parenting programs must by their very nature take into consideration the abilities and mental conditions of the parents[,]" but the determination of reasonableness does not turn on the success of those efforts. A.G., 344 N.J. Super. at 442. Such a determination is fact specific and depends on the circumstances of each case. DMH, 161 N.J. at 390. "'Even if the Division ha[s] been deficient in the services offered to' a parent, reversal of the termination order is not necessarily 'warranted, because the best interests of the child controls' the ultimate determination regarding termination of parental rights." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (quoting N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007)).

Citing I.S., 202 N.J. at 178-80, Betty argues one-hour weekly visitation supervised in the Division's office was unreasonable. In I.S., the Court found the Division failed to satisfy the third prong of the best interest test. Ibid. The

Court noted the importance of providing appropriate visitation to assist in reunification of the parent and child.  Id. at 178-79.  Although the Court found the Division offered services in the form of visitation, paternity testing for the defendant, and considered relatives as resource placements, it concluded the Division failed to offer services sufficiently tailored to facilitate reunification in order to satisfy its burden under prong three of the best interests test.  Id. at 177-78.

The circumstances here were different, and Betty's argument that the inadequate visitation was the reason for the adverse outcome misreads the record.  Indeed, the Division made extensive efforts on other fronts to engage Betty in mental health and substance abuse services designed to remedy the circumstances which led to John's removal.  From the time John was removed until the trial, it was Betty's mental impairments and behavioral instability which prevented her from taking advantage of the visitation, not the reverse.  Moreover, Betty's drug use prior to visitation, and her conduct during it, demonstrated increased visitation would continue to place John at risk of harm and would not facilitate the Division's obligations under the third prong.

We also reject Betty's arguments that prong three was not met because the mental health services provided were unreasonable because she was "not the

typical client based on her history and mental impairments[,]" and thus could not be entrusted to enroll in the services on her own.  The record demonstrates the Division made substantial efforts to engage Betty in mental health services, including requiring she have psychological evaluations, substance abuse evaluations and treatment, referrals to mental health services, transportation assistance, and family team meetings.  However, Betty refused to comply with services and claimed she did not need them.  The record does not support the notion the Division merely referred Betty for services without follow-up.  The trial judge's prong three determination is supported by substantial credible evidence in the record.

C.

Finally, Betty argues there is no evidence to support the trial judge's finding that John's continued contact with her would do more harm than good. Betty argues the fourth prong was not established because she never harmed John, but instead fed him, changed his diapers, and displayed affection during visitation, and claims Dr. Katz's observations corroborated this.  We disagree.

Prong four "serves as a fail-safe against termination even where the remaining standards have been met."  G.L., 191 N.J. at 609.  "The question to be addressed under [prong four] is whether, after considering and balancing the

24

two relationships, the child will suffer a greater harm from the termination of ties with [his] natural parents than from permanent disruption of [his] relationship with [his] foster parents."  I.S., 202 N.J. at 181 (citations and quotation marks omitted).  "[T]o satisfy the fourth prong, the [Division] should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents."  F.M., 211 N.J. at 453 (citations and internal quotations omitted).

The court's prong four determination is supported by ample credible evidence in the record, including the unrebutted expert testimony of Dr. Katz regarding Betty's parenting deficits and lack of a bond with John.  As Dr. Katz opined, John's developmental delays required a caregiver who would address them.  Betty had no plan to meet the child's needs, and her failure to address her own mental health deficits, which manifested themselves during the case through paranoid delusions and threats of violence, only underscored that she would place John at substantial risk of harm.

Dr. Katz's unrebutted testimony proved John had significant attachment to the resource parent and would suffer harm if the relationship were severed. John was happy and joyful with the resource parent, unlike his demeanor when

with Betty.  Dr. Katz opined Betty would be incapable of remediating the severe and enduring harm John would suffer if his relationship with the resource parent were severed.  The judge's determination as to prong four of the best interest test was supported by substantial credible evidence in the record and we will not disturb it.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3318-17T4